## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CASE NO.:

SURGERY CENTER OF VIERA, LLC,

     *Plaintiff,*

v.

UNITEDHEALTHCARE INSURANCE
COMPANY, SIEMENS CORPORATION,
and SIEMENS CORPORATION GROUP
INSURANCE FLEXIBLE BENEFITS
PROGRAM,

     *Defendants.*

_____/

## COMPLAINT

Plaintiff, Surgery Center of Viera, LLC ("SCV"), as medical provider, authorized representative, and assignee of patient / insured, P.M., sues Defendants, UnitedHealthcare Insurance Company ("UHC"), Siemens Corporation ("Siemens"), and Siemens Corporation Group Insurance and Flexible Benefits Program (the "Plan"),[1] as follows:

---

[1] The 2018 Plan document that SCV happened to possess is attached hereto as **Exhibit A** and incorporated fully herein by reference. This Plan appears to be self-funded / self-sponsored. So, if Siemens had nothing to do with pre-suit claim and / or appeal decision-making as to the unreasonably low rate of payment at issue here (*i.e.*, the liability component of Counts II-IV below), SCV is willing to dismiss without prejudice the Siemens Defendants as to Counts II-IV if it were to agree / stipulate as to the following: prompt satisfaction of monies deemed owed to SCV by the trier of fact; *i.e.*, prompt satisfaction of outstanding benefits when UHC's claim / appeal decision-making as to the amount of medical service monies tendered to SCV is someday determined improper. Similarly, SCV would be willing to dismiss without prejudice the Siemens Defendants as to Count I below if it was to agree / stipulate as to the following: prompt provision of outstanding administrative records and satisfaction of related penalty, or prompt provision of

1

## NATURE OF THE ACTION, PARTIES, JURISDICTION, AND VENUE

1.      This action arises, in part (Count I), under the Employment Retirement Income Security Act of 1974, Title 29, United States Code, Sections 1000-1461 ("ERISA"), for Defendants' administrative record production failures relating to the subject P.M. health insurance claim, implicating ERISA, 29 U.S.C. § 1024(b), 29 U.S.C. § 1132(c)(1), 29 C.F.R. § 2575.502c-1 to be precise, and 29 C.F.R. § 2560.503-1(h)(2)(iii).[2] This action also arises, in part (Counts II-IV), under state law for Defendants' wrongful, unsubstantiated underpayment of monies owed to SCV for medical services SCV provided to the patient / insured, P.M., on September 25, 2018, which such causes of action have absolutely nothing to do with "right of payment" / coverage (*i.e.*, have everything to do with unreasonably low "rate of payment" / benefits) and which such causes of action

---

an affidavit (or the like) stating that UHC was solely responsible for records production; *i.e.*, stating that records production responsibilities had been delegated to UHC.

[2] One of the many problems created by Defendants' refusal to timely produce the administrative record and / or other germane documents required by Federal Codes and / or insurance contract (discussed in greater detail below in the common allegations and Count I) is SCV's inability to confirm with 100% certainty that the underpayment aspect of this dispute emanates solely from a pricing dispute, but that certainly appears to be the situation, hence this Complaint being pleaded as a "rate of payment" dispute *predicated purely on third-party re-pricing contracts separate and distinct from the insurance policy / plan document*. Federal authority makes clear that a "rate of payment" dispute is subject to state law rather than ERISA federal law, especially where (as here) the resolution of Counts II-IV does not have a significant enough (or hardly any) relationship to the insurance policy / plan document. Because Defendants' legally and contractually repugnant refusal to timely produce administrative / germane records has stymied SCV's ability to make precise heads-or-tails of the reasons for Defendants' claim underpayment (as was / is SCV's legal and contractual right), SCV reserves the right to amend this Complaint (if necessary) to expound on Counts II-IV relating to owed monies once Defendants are made to produce the germane documentation / information (Count I) upon which the claim payment amount decision was based.

have to do with third-party re-pricing contracts separate and distinct from the insurance policy / plan document.[3]

2.      At all material times, SCV was a medical provider and a Florida limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Viera, Florida, Brevard County. SCV is *sui juris* in all respects. SCV's members are as follows: (a) Dr. Ara Deukmedjian, domiciled in Brevard County, Florida, (b) Sun Deukmedjian, domiciled in Brevard County, Florida, and (c) Dr. Bharat Patel, domiciled in Brevard County, Florida. At all material times, SCV was the authorized representative of P.M. with an assignment of benefits as well,[4] having provided subject medical services to P.M. for which a proper amount of compensation (Counts II-IV) was / is due and owing and records relating to same (Count I) were / are due and owing. And, again, Defendants honored such authorized representative and assignee capacities by, for examples, carrying out pre-suit appeal with SCV (and / or SCV counsel) and tendering partial claim payment directly to SCV. At the very least, such pre-suit Defendants conduct constitutes a waiver and / or estoppel of any anti-assignment argument Defendants may try to *ex post facto* make in the courtroom.

3.      At all material times, UHC was an insurance company with its state

---

[3] Due to the records production failure mentioned in footnote 2, *supra*, SCV reserves the right to amend this Complaint (if necessary) to expound on Counts II-IV related allegations after Defendants' production of outstanding records (Count I).

[4] All germane authorization and / or assignment paperwork in SCV's possession is attached hereto as **Exhibit B** (in redacted form) and incorporated fully herein by reference.

of incorporation and principal place of business / headquarters ("nerve center") in the State of Minnesota and engaged in the business of selling insurance, administering insurance, and / or deciding and paying insurance claims throughout the country, including in the State of Florida.

4.      At all material times, Siemens was a company with its citizenship (*i.e.*, state of incorporation) in the State of Delaware and its principal place of business / headquarters ("nerve center") in Washington, D.C. and engaged (in pertinent part here) in the administration and / or sponsorship of the Plan. The Plan has the same citizenship and nerve center as Siemens, Delaware and Washington, D.C., respectively.

5.      This Court possesses original jurisdiction pursuant to Title 29, United States Code, Section 1132(c)(1), and Title 28, United States Code, Section 1331 at least with respect to Count I. Pursuant to Title 28, United States Code, Section 1367, the Court has pendent jurisdiction over Counts II-IV. Moreover, this Court has jurisdiction over the entire dispute anyway pursuant to Title 28, United States Code, Section 1332, as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00 exclusive of interest, costs and attorney's fees.

6.      Venue is proper in the Middle District Court of Florida pursuant to Title 28, United States Code, Section 1391(b), since, for examples, (a) a substantial part of the events or omissions giving rise to the subject action occurred in this jurisdiction, namely the subject medical procedure, Defendants'

underpayment of the subject insurance claim both at the initial claim and subsequent pre-suit appeal stages (Counts II-IV), and Defendants' refusal to supply germane documentation / information required by federal law (Count I) and the insurance contract for that matter and the final appeal decision letter for that matter, and (b) the Orlando Division of this Court has personal jurisdiction due to Defendants' minimum contacts in this forum.

7.    All conditions precedent to the institution of this action (*e.g.*, administrative pre-suit appeals) have occurred, been performed, been waived, or were futile.

<h2 style="text-align:center">COMMON ALLEGATIONS</h2>

8.    The Plan's Group number was / is 702457. Again, a copy of the insuring agreement (which is separate and distinct from the re-pricing contract / agreement at issue in this lawsuit, *see* **Exhibit C** incorporated fully herein by reference, and whatever mystery re-pricing program UHC employed) is attached as Exhibit A and incorporated fully herein by reference. Moreover, P.M.'s Member ID No. was / is 875926874. Moreover, UHC's assigned Transaction No. W1141600021.

9.    At all material times, P.M. was covered (*i.e.*, coverage is not an issue here) by the Plan as evidenced by several things, with examples now discussed.

a.    If P.M. was not an eligible / covered insured, the subject claim would not have been paid by Defendants in any amount, and this eligibility and claim payment correlation reality is stated in the pre-authorization paperwork (Authorization No. A050096981) discussed

below and attached as **Exhibit D**. Exhibit D, made up of a July 17, 2018, UHC authorization letter, is incorporated fully herein by reference.

b. If the subject surgery (which such surgery was broken down by codes found in the HCFA found in SCV's initial claim submission packet) had not been covered,[5] the subject claim would not have been paid by Defendants in any amount. Regarding coverage of the subject HCFA codes, Defendants' EOB furnished by UHC (further discussed below) is attached as **Exhibit F** and evidences Defendants' coverage decision. Exhibit F (made up of an EOB dated November 2, 2018) is incorporated fully herein by reference. As one can plainly see from the UHC-issued EOB, Defendants unilaterally re-priced the subject claim and did not deny any aspects of the claim on coverage grounds (*e.g.*, medical necessity, experimental / investigational). To this day, we really have no idea how UHC came up with payments totaling $46,164.46 (on a billed amount of $193,348.00) because at every turn (SCV's requests and undersigned counsel's requests), Defendants have secreted how they came up with the aforementioned rate of payment; *i.e.*, have never substantiated their determination that $46,164.46 was a "reasonable" or "recognized" amount for of

---

[5] The HFCA form was part of SCV's claim submission package to Defendants. SCV's claim submission package is attached hereto as **Exhibit E** and incorporated fully herein by reference.

payment for the subject procedure. "Unilaterally" because an applicable re-pricing contract (that SCV had actually agreed to, unlike the unagreed to UHC mystery re-pricing contract / agreement / formula / program) was already in place (*see* Ex. C). Again, Plaintiff presently does not possess the paperwork associated with the mystery UHC re-pricing formula because Defendants have wrongly secreted this paperwork (the very paperwork that would evidence how Defendants came up with their unreasonably low rate of payment) from SCV in their perpetual refusal to substantiate the unjustifiably low rate of payment force-fed to SCV here. But, as with the re-pricing contract (Ex. C) that SCV maintains should apply here in determining the proper rate of payment not the mystery UHC re-pricing contract / agreement / formula / program unilaterally implemented by Defendants in arriving at the disputed unreasonably low claim payment amount is also separate and distinct from the insurance policy / plan document (Ex. A). Meaning, there is absolutely no "relation to" defensive ERISA preemption at play with a pricing dispute of this nature predicated on re-pricing contracts standing alone from Exhibit A.

In sum, as evidenced by the variety of things noted in this averment, this action has nothing to do with coverage (*i.e.*, "right of payment"), it has everything to do with the amount Defendants paid out (*i.e.*, "rate of payment") on covered

HCFA codes based on a mystery UHC re-pricing contract / formula / program separate and distinct from the plan insurance document (Exhibit A). In other words, the mystery UHC re-pricing contract / formula / program that Defendants used in re-pricing the subject claim and the re-pricing contract / agreement (Ex. C) that SCV contends should have been used do not "relate to" the Plan document (Ex. A); *i.e.*, resolution of Counts II-IV will not relate to (at least not beyond a fleeting reference to, at most) the Plan document (Ex. A).[6] Once more, "relation to" defensive ERISA preemption simply does not apply here in relation to Counts II-IV. And as many Courts (several in this jurisdiction, to boot) have found, complete preemption most definitely does not apply to cases of this ilk.

10.    The fact that this dispute has nothing to do with coverage (*i.e.*, has everything to do with pricing / rate of payment) is further evidenced by Defendants' pre-surgery authorization paperwork (*see* Ex. D). The pre-surgery authorization paperwork (Ex. D) and process is designed to put coverage (but not the eventual amount of claim payment) to rest, which, as discussed above (and as evidenced by Ex. D) is what happened – Defendants deemed the subject procedure medically necessary (which such medical necessity would relate to coverage). Exhibit D is incorporated fully herein by reference.

11.    At all material times leading up to the subject medical services

---

[6] This averment refers to Defendants' re-pricing methods as "mystery" for two reasons. First, again, Defendants did not produce any materials showing how their re-pricing unfolded to arrive at the low rate of payment that they arrived at, notwithstanding SCV's and / or undersigned counsel's request(s) for same (discussed below, namely in relation to Count I). Second, Defendants' EOB (Ex. F) is the epitome of naked.

received from SCV, P.M. suffered from cervicalgia, cervicobrachial syndrome, and cervical radiculopathy. *See, e.g.*, SCV Operative Note, Ex. E. P.M. tried alternative, conservative management treatments, which failed and surgical treatment was deemed medically necessary by both SCV (as evidenced by, for examples, the "operative note," "history and physical," and "letter of medical necessity for surgery" found in SCV's claim submission package, *see* Ex. E) and UHC (as evidenced by, for example, the pre-authorization paperwork attached as Exhibit D). So, on September 25, 2018, SCV operated on P.M. to remedy the medical conditions.

12.    By letter dated July 17, 2018, and prior to the subject procedure, UHC issued information to SCV approving surgical codes. As mentioned above, this paperwork is attached as Exhibit D.

13.    As mentioned above, SCV's billed charges for the subject medical services rendered to P.M. totaled $193,348.00, and a claim package was submitted to UHC relating to same shortly after the subject procedure. *See* Ex. E. The SCV cover letter to its claim submission packet (*see* Ex. E) makes specific reference to SCV's appropriate expectation that claim payment would unfold pursuant to the Preferred Medical Claim Solutions ("PMCS") (*see* Ex. C) that existed (not some unknown UHC re-pricing contract that Defendants would eventually unilaterally employ), which, again, such re-pricing contract (even the yet discovered re-pricing contract / formula / program that Defendants employed) is separate and distinct from the plan document (Exhibit A); *i.e.*, again, resolution of Counts II-IV (which

hinge on the appropriate re-pricing mechanism) will require little (if any) reference to Exhibit A and certainly not a substantive reference to / "interpretation of" Exhibit A, which such substantive reference / "interpretation of" a plan document (rather than a cursory glance at a plan document, as *might* be required here) in order to resolve a rate of payment dispute is what would militate toward "relation to" defensive ERISA preemption.

14.     At all material times, UHC was in agreement with PMCS (as UHC's affiliate and / or subcontractor and / or vendor and / or agent and / or the like) to secure discounted rates from providers (like SCV), which were secured here in relation to SCV.[7]

15.     The PMCS allowed amount re-pricing contract (*see* Ex. C) was in full force and effect and was a legally valid and binding contract that established / developed (a) an allowed amount re-pricing rate of 80% of SCV's billed charges less patient responsibilities (*e.g.*, co-pay, deductible, co-insurance) subject to the patient's annual out-of-pocket maximum, and (b) a 100% reimbursement rate for hard costs (*e.g.*, prosthetics / implants).

16.     Notwithstanding the existing PMCS contract / agreement in place

---

[7]Again, a copy of the pertinent pages of the PMCS re-pricing contract that was procured on UHC's behalf (along with the PMCS "client" list listing UHC) is attached hereto as Exhibit C. Again, Exhibit C is incorporated fully herein by reference. Again, SCV made clear its expectation that the claim would be priced pursuant to this PMCS contract / agreement that were brokered by UHC with PMCS being UHC's vendor, agent, or the like tasked with achieving discounted rates from medical providers like SCV. Exhibit C is made up of SCV's side of the PMCS contractual relationship with Defendants because Defendants have not yet produced paperwork pertaining to their side of the PMCS contractual equation (another reason for Count I).

(which, again, was arranged by UHC with PMCS as its vendor / agent), by way of EOB dated November 2, 2018, *see* Ex. F, on UHC letterhead (and with Siemens' logo at the top of the EOB, for that matter), Defendants underpaid the subject claim, tendering $46,164.46 predicated on some mystery "other source" re-pricing formula falling outside Exhibit A. More specifically, Defendants failed to properly pay (proper amount, that is) the codes billed by SCV in connection with the medical procedure. The nakedness of the EOB (Ex. F) is plain, and this "leave SCV in the evidentiary dark" problem was compounded by Defendants' failure to provide SCV and undersigned counsel with requested records (Count I).

17.    This matter does not present a coverage dispute (*i.e.*, "right of payment" dispute) because Defendants properly conceded coverage *via* the $46,164.46 partial claim payment and did not list any medical judgment related basis (*e.g.*, medical necessity or experimental / investigational) for partial payment amongst the claim decision EOB codes (*see* Ex. F). Rather, this is a damages dispute (*i.e.*, "rate of payment" dispute) pertaining solely to the underpayment that was predicated on Defendants' aberrant claim decision-making seemingly predicated on the unsubstantiated mystery "other source" rate system employed (if a system even exists) by Defendants. And, again, whatever mystery re-pricing contract / formula / agreement / program that was employed by Defendants is outside of Exhibit A. To be clear, and again, this dispute revolves around the re-pricing established by Defendants separate and distinct from Exhibit A and SCV's contention that the re-pricing contract separate and distinct from Exhibit A that

11

should have been employed (*see* Ex. C).  To be clear, and again, the re-pricing dispute does not involve a substantive "interpretation of" (or perhaps any "interpretation of") Exhibit A.

18.     Following the adverse Defendants claim underpayment *via* EOB dated November 2, 2018, appeals and / or reconsideration processes were thoroughly carried out by SCV. SCV's redacted appeal letters (dated August 29, 2018, and April 2, 2019) are attached hereto as **Exhibit G** and are fully incorporated herein by reference. To no avail, Defendants maintained (without any true explanation, let alone production of germane documentation explaining) their unreasonably low claim payment rate at every turn. Defendants' maintaining their decision to pay an unreasonably low about to SCV in relation to the subject procedure culminated with Defendants' final adverse decision letter dated May 21, 2019.

19.     To this day, Defendants continue to keep SCV in the absolute dark as to how a total claim payment of $46,164.46 on a billed amount of $193,348.00 was arrived at and / or is legitimate.

20.     By letter dated January 8, 2019, undersigned counsel sent correspondence to UHC advising Defendants that he represented Plaintiff, SCV. The letter contained a request for the entire administrative record / claim file pursuant to the law (the United States Code and, to some extent, Florida Statute) and / or the subject policy / plan documents for that matter. A redacted copy of the aforementioned letter is attached hereto as **Exhibit H** and incorporated fully herein by reference.  At no time did Defendants oblige any of the germane materials

requested by undersigned counsel. By letter dated April 24, 2019, UHC purported to supply responsive documentation (referencing a forthcoming CD), but the CD never came.

21.    As for ERISA-oriented documentation / information production requirements (which relates to Count I below), the insurance policy / contract also speaks to same. *See, e.g.,* Ex. A at 159, 163-165. This, of course, squares with the Federal Codes cited in, for example, Paragraph No. 1 above.[8]

22.    Defendants were legally obligated to either directly provide the aforementioned requested documentation / information (*see* Ex. H) to SCV pursuant to federal codes cited above, in whole or in part, and / or contractually obligated.

23.    There was no Defendants' production in response to undersigned counsel's letter (Ex. H); *i.e.*, there was no Defendants' production of the insurance policy / Plan document or documentation purportedly substantiating whatever re-pricing formula Defendants implemented in arriving at their unreasonably low rate of payment, for examples.

24.    So, regrettably, SCV's (and P.M.'s) entire valuable pre-suit remedies process (which such pre-suit mechanisms ERISA designed to try to avoid lawsuits like this) was squandered by Defendants by keeping SCV in the "evidentiary" blind due to Defendants' documentation / information production failures and naked

---

[8] So, if for some reason the Court finds Count I (sounding in federal codes) untenable, SCV respectfully requests leave to amend Count I to sound in breach of contract instead.

paperwork (*e.g.*, EOB). Defendants' failures, of course, also compromised SCV's ability to make heads-or-tails of Defendants' unreasonably low rate of payment.

25.    Again, if one looks at the EOB (which does not necessitate examination or "interpretation of" Exhibit A), it is plain that coverage is not at issue here – Defendants properly conceded coverage *via* initial partial payment. *See* Ex. F. And, again, as to the HCFA codes that SCV places at issue in this lawsuit, one can also look to the pre-authorization paperwork (which does not necessitate examination or "interpretation of" Exhibit A) to see that coverage is not at issue here. *See* Ex. D (as stated earlier, Exhibit D shows that the subject pre-authorization put coverage issues to rest, leaving only pricing issues). Again, the sole issue here is one of payment amount, so we turn now to germane insurance policy language in that vein just for a baseline understanding (not at all for substantive reliance).

26.    As to re-pricing, the insurance policy / Plan document (Ex. A) provides that payment of benefits is to unfold pursuant to a Reasonable and Customary Charges analysis, with the policy / Plan document defining Reasonable and Customary, in pertinent part, as follows:

> The prevailing rate or normal range of fees charged by physicians, dentists, and other health care providers of similar standing in a given locality for a covered service or supply, as determined by the Claims Administrator.    Out-of-Network    claims    administered    by UnitedHealthcare … are paid on the basis of an R&C rate.

Ex. A at 185.

27.    The policy / Plan document definition of "Reasonable and Customary" squares with what PMCS (a UHC re-pricing vendor) assesses in establishing rate

of payment. This is where the fleeting examination of Exhibit A would end in this case, which such fleeting examination does not rise to the level needed to establish "relation to" ERISA defensive preemption.

28.    Again, where (as here) a separate and distinct re-pricing contract / agreement has been established, such a contract / agreement supplants the insurance policy / Plan document, especially where (as here) the re-pricing vendor assesses the same kind of data contemplated by the insurance policy's / Plan document's re-pricing language. Defendants' own conduct evidences that much at least – Defendants implemented an UHC re-pricing contract / agreement / formula / program separate and distinct from Exhibit A. The re-pricing program that Defendants tried to pull off did not "relate to" the aforementioned policy re-pricing options, so Defendants should not now (through their lawyers' *ex post facto* arguments) be heard to say that "relation to" defensive preemption applies to this dispute – at minimum, what is good for the goose is good for the gander.

29.    Defendants' implementation of their mystery re-pricing contract / agreement / formula / program is untenable because SCV did not agree to same.

30.    Defendants erred in refusing SCV's pre-suit requests for germane documentation / information, including documentation / information concerning what re-pricing / allowed amount formula Defendants employed in arriving at the unreasonably low rate of payment. For example, undersigned counsel's January 8, 2019, letter (Ex. H) to Defendants asked for the following:

> **(14)** All guidelines, manuals, written protocol, medical treatises, medical literature, and / or the like upon which the carrier partially or wholly based

its claim(s) decisions; **(15)** All billing paperwork, rate schedules, data or formulas relating to "usual, customary, reasonable" (UCR) medical provider charges, and / or any other data upon which the carrier has based its decisions as to how much indemnity to afford on the subject claim(s);

31.    Defendants wronged SCV in many ways, most notably by way of the significant underpayment. Defendants should have employed the PMCS re-pricing contract (Ex. C) already in place (*i.e.*, already agreed to between the parties) to assess a proper re-priced amount; but, instead, Defendants implemented a mystery re-pricing system (not agreed to by SCV) separate and distinct from Exhibit A to arrive at the unreasonably low rate of payment at issue.

32.    Under the PMCS re-pricing analysis (which, again, was a re-pricing contract / agreement established by UHC that SCV actually agreed to, and unlike the UHC re-pricing contract / agreement / formula / program that Defendants unilaterally employed here without SCV's agreement), Defendants should have used an 80% / 100% re-pricing formula to calculate the allowed amount equaling $162,416.80 (which such amount is 80% of all non-implant HCFA line-items and 100% of all implant HCFA line-items). This is the amount that the assumed patient responsibilities (capped at an annual out-of-pocket maximum) should have been deducted from. The $162,416.80 less Defendants' prior payment (which such prior payment presumably already took patient responsibilities subject to the annual out-of-pocket maximum into consideration) leaves an outstanding balance of $116,252.34 due and owing to SCV. This amount is exclusive of attorneys' fees,

costs, interest, and / or extra-contractual exposure.[9]

33.    SCV has suffered significant financial harm no matter how one slices this situation. The financial harm by way of owed medical services monies is in excess of $75,000.00, not including interest of attorneys' fees, costs, or interest, if, for examples, the negotiated, agreed to 80% / 100% rate system prescribed by UHC's third-party re-pricing vendor (PMCS) is honored / enforced as it should be, or even if rates prescribed by publicly available databases assessing the charges of providers of like kind within like geographies, like AHCA, were utilized in the re-pricing assessment. *See* n. 9, *supra*.[10]

34.    SCV exhausted the pre-suit appeal process to the best of its ability, hindered by Defendants' wrongful refusal to provide administrative records / claim file / germane documentation required by federal codes (and / or, for that matter, like records available per insurance contract or Florida Statute requiring explanation / substantiation to the recipient of an adverse benefits determination, here SCV), in an effort to accomplish Defendants' doing the right thing (*i.e.*,

---

[9] Even if the trier of fact someday somehow finds PMCS re-pricing inapplicable, Defendants still breached the insurance policy / Plan document by plainly not following geographically derived pricing databases available in the public domain, such as the Agency for Health Care Administration ("AHCA"). *See, e.g.,*
http://www.floridahealthfinder.gov/LandingPages/HospitalASC.aspx                and
http://www.floridahealthfinder.gov/CompareCare/SelectChoice.aspx.

[10] To be clear, it is SCV's position that the PMCS re-pricing contract (*see* Ex. C) supplanted the Plan document's re-pricing formula (see ¶ 26, *supra*) and should have dictated the re-pricing of the subject claim. If, however, this Court somehow determines that the PMCS re-pricing contract is untenable, SCV respectfully requests the ability to amend the Complaint's underpayment counts (Counts II-IV) to sound in the Plan document language found in Paragraph 26 above because Defendants' unreasonably low rate of payment did not follow geographically-oriented re-pricing databases.

properly compensating SCV) sans litigation, to no avail. Hence, this lawsuit as SCV's regrettable last resort.

**COUNT I – PETITION TO COMPEL PRODUCTION OF THE "ADMINISTRATIVE RECORD" <u>AND</u> FOR RECOVERY OF ADMINISTRATIVE RECORD PRODUCTION FAILURE PENALTY PURSUANT TO ERISA, 29 U.S.C. § 1024(B), 29 U.S.C. § 1132(c)(1), 29 C.F.R. § 2575.502c-1, AND 29 C.F.R. § 2560.503-1(h)(2)(iii)**

SCV re-alleges Paragraphs 1 through 34 (namely, as it pertains to this Count, Paragraphs 1, 9(b), 19-24, 30, 34) as if fully set forth herein, and further alleges as follows.

35.    This is a claim for production of the administrative record <u>and</u> for award of administrative record production failure penalty pursuant to Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), Title 29, Code of Federal Regulations, Section 2575.502c-1, and Title 29, Code of Federal Regulations, Section 2560.503-1(h)(2)(iii).

36.    By letters (referenced in the above common allegations, *see, e.g.,* Ex. H), SCV and / or its legal counsel asked Defendants to provide the administrative record / germane documentation in relation to the P.M. claim, mainly (but not entirely) to learn Defendants' reasons for claim underpayment so that SCV could contest same in an educated fashion (pre-suit and, only if need be, in suit).

37.    Defendants shirked their legally (whether that be United States Code or Florida Statutes) and also contractually prescribed (*see* ¶ 21, tracking ERISA and ERISA's appeal structure) administrative / germane record production responsibilities.

38.     Per the above-cited United States Code and Code of Federal Regulations, *see* ¶¶ 1 and 35, *supra*, the $110.00 / day administrative penalty started accruing February 8, 2019.[11]  From February 8, 2019, through the date of this Complaint April 25, 2022, 1172 days have passed without Defendants' satisfaction of the administrative record / germane record requests made in the aforementioned letters regarding the P.M. claim. So, as of the filing date of this Complaint, the $110.00 / day administrative penalty totals $128,920.00. Of course, the $110.00 / day penalty will continue to accrue until such time that Defendants oblige the germane documentation / information requests (*e.g.,* a certified copy of the policy / plan document, payment rate schedules / formulas, *et cetera*) set forth in the January 8, 2019, letter noted above. *See* Ex. H.[12]

39.     SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' wrongful withholding of the administrative record / germane documentation; *i.e.*, claim and appeal decision-making paperwork, which such paperwork necessarily includes, among other things, paperwork showing exactly how Defendants arrived at their unreasonably

---

[11] This represents the date which falls 31 days after the January 8, 2019, request for the administrative / germane records. *See* Ex. H.

[12] Again, the insurance policy (Ex. A) provides for the very production sought in the January 8, 2019, letter (Ex. H). *See* ¶ 21, *supra*. There is really no need for one to significantly assess this insurance policy language (because of United States Codes and Code of Federal Regulations dictating documentation / production anyway), but it is cited herein to demonstrate that the insurance policy squares with the federal codes under which Count I is brought. And there is obviously no ERISA preemption issue applicable to consulting the insurance policy / plan document (Ex. A) in relation to Count I anyway because Count I (unlike Counts II-IV) sounds in ERISA.

low rate of payment.

40.    As a further result of Defendants' refusal to produce the administrative record / germane documentation, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover reasonable attorneys' fees and costs pursuant to Title 29, United States Code, Section 1132(g)(1) or as otherwise awardable.

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, respectfully requests (a) Court order compelling Defendants, UnitedHealthcare Insurance Company, Siemens Corporation, and Siemens Corporation Group Insurance and Flexible Benefits Program, to produce the outstanding administrative record / germane documentation posthaste and allowing SCV thirty days following production of the administrative record / germane documentation to amend this Complaint (if necessary), (b) an award to SCV of the administrative record production failure penalty incurred by Defendants pursuant to Title 29, United States Code, Section 1132(c)(1), Title 29, United States Code, Section 1024(b), Title 29, Code of Federal Regulations, Section 2575.502c-1, and Title 29, Code of Federal Regulations, Section 2560.503-1(h)(2)(iii), (c) an award to SCV of attorneys' fees (pursuant to Title 29, United States Code, Section 1132(g)(1)) and costs incurred bringing this action, and (d) the Court's affording of any other relief the Court deems equitable, just, and / or proper.

## COUNT II – BREACH OF RE-PRICING CONTRACTS / AGREEMENTS (CLAIM UNDERPAYMENT)

SCV re-alleges Paragraphs 1 through 34 (namely, as it pertains to this Count, Paragraphs 8-19, 24-29, 31-33) as if fully set forth herein, and further alleges as follows.

41.    At all material times to this action and in exchange for a valuable premium, Defendants provided health insurance to P.M. under the Plan document (Exhibit A).

42.    The subject medical services were covered under the Plan document, as evidenced by, for examples, (a) Defendants' partial payment relating to same, (b) the issued EOB (Ex. F), (c) pre-authorization paperwork (Ex. D) approving the subject HCFA codes (Ex. E), and (d) *et cetera*. A fuller discussion as to why coverage is not at issue in this pure pricing dispute can be found in the above common allegations, namely Paragraphs 9-10.

43.    Defendants erred in deciding to not fully compensate SCV by only tendering a $46,164.46 underpayment in relation to $193,348.00 in billed charges predicated on Defendants' mystery re-pricing contract / agreement / formula / program separate and distinct from Exhibit A. As to all codes set forth on the HCFA (Ex. E), Defendants should have honored the re-pricing contract (PMCS) included in Exhibit C that the parties had actually already agreed to. Defendants' payment amount comes nowhere close to the re-pricing formula prescribed by PMCS (80% HCFA non-implant codes / 100% HCFA implant codes). *See* ¶ 32, *supra*.

Defendants' payment amount is accordingly in breach of the subject re-pricing contracts (Ex. C).[13]

44.     Defendants' $116,252.34 payment shortage (*see* Paragraph 32 above) does not constitute a usual, customary, reasonable re-priced / allowed amount no matter how one views the situation. First, for example, a third-party repricing vendor who UHC contracts with (*e.g.*, PMCS) have established SCV's UCR based re-priced / allowed amount at 80% of billed charges (at least pursuant to PMCS in relation to non-implant HCFA line-items). Second, as another example, unbiased public databases (*e.g.*, AHCA, *see* n. 9, *supra*) assessing the rates of providers of like kind within like Florida geographies make clear that Defendants' unsubstantiated unreasonably low payment does not find support amidst UCR rates relating to providers of like kind within like Florida geographies.

45.     Defendants, among other things, had a duty to properly investigate the subject medical services, adjust / investigate the subject SCV claim relating to such services, and fully compensate SCV in relation to same. Defendants failed SCV in these regards (most notably with respect to their failure to pay the monies due and owing under the subject re-pricing contracts), which breached the subject re-pricing contract / agreement (Ex. C) and / or violated Florida law. And, again, such

---

[13] And, again, at minimum, Defendants' payment amount also does not come anywhere close to "reasonable and customary" rates within the subject geography. Again, that kind of information can be easily found in the public domain through very reputable sources. So, even if it is someday determined that the PMCS re-pricing contract did not supplant the insurance policy / Plan document in the re-pricing vein, Defendants still breached the insurance policy Plan document. *See* n. 9-10, *supra*.

underpayment even runs afoul of the Plan document's geographical assessment.

46.    As a direct, foreseeable, and proximate result of Defendants' breach of their obligations under the re-pricing contracts, SCV has suffered and continues to suffer damages.

47.    SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject P.M. medical services.

48.    As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement).

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, UnitedHealthcare Insurance Company, Siemens Corporation, and Siemens Corporation Group Insurance and Flexible Benefits Program, for liability and for damages including, but not limited to, (a) past-due contractual monies owed in relation to the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement), (c) costs incurred bringing this action, and (d) for such other relief as this Court deems

equitable, just and proper.

## COUNT III – UNJUST ENRICHMENT

SCV re-alleges Paragraphs 1 through 34 (namely, as it pertains to this Count, Paragraphs 8-19, 24-29, 31-33)[14] as if fully set forth herein, and further alleges as follows.

49.    SCV conferred a direct benefit on Defendants by providing Defendants' insured / member (P.M.) with medical services to which the insured was entitled under the insurance policy (covered) as evidenced by Defendants' partial payment. Examples of "conferral of benefit" would include the following, for examples, which are posed as questions: (a) What about Defendants receiving the benefit when their policyholder / employee received care and treatment offering Defendants' insurance policy as their primary method of payment? (b) What about the good health of P.M. conferred on Defendants? Was it not of benefit to Defendants that SCV minimized (if not entirely eliminated, actually) P.M.'s future medical expense (and insurance claims to Defendants) relating to the subject conditions such as prolonged alternative treatments or a return for more (and perhaps more complex) surgery due to complications arising out of some other inferior treatment regimen?

50.    Defendants voluntarily accepted and received the benefit conferred by SCV, with the knowledge that SCV expected to be paid the reasonable value of

---

[14] Note that the specific common allegation paragraphs referenced here are the same as Count II because this Count III is pleaded in the alternative to Count II.

its services; *i.e.*, SCV's usual, customary, reasonable charges as prescribed by reasonable, negotiated re-pricing vendor (PMCS) or, for that matter, as prescribed by Florida's publicly available AHCA database assessing rates of various medical providers of like kind within like geography (*see* n. 9-10, *supra*). Again, as to Defendants' knowledge, there are several things supportive of same in the above common allegations; *e.g.*, the pre-authorization process, SCV's claim submission package cover letter and package (which such package included reference to SCV's re-pricing expectation through PMCS), the parties' past dealings with each other (in particularly UHC and SCV, but perhaps also Siemens and SCV), and *et cetera*.

51.     Defendants voluntarily accepted and received the benefit conferred by SCV, with the knowledge (through course of past dealings with SCV that included claim submission cover letters such as that attached indicating re-pricing contract expectations, or otherwise) that SCV expected to be paid the reasonable value of its services; *i.e.*, SCV's UCR charges as prescribed by reasonable re-pricing vendors (PMCS) or, for that matter, as prescribed in the Florida's publicly available AHCA database assessing rates of various medical providers of like kind within like geography. But what is clear is that Defendants' unreasonably low payment amount predicated on some mystery "other source" re-pricing formula was / is entirely unacceptable.

52.     Defendants have not paid the value of the benefit conferred by SCV in that Defendants have significantly underpaid SCV's claim for monies owed in relation to the medical services provided to P.M.

53.    Defendants' underpayment results in a windfall for Defendants in that (a) Defendants collect premiums in return for agreeing to properly compensate providers, like SCV, who render covered medical services, and / or (b) Defendants enjoy an unearned profit in relation to the insurance benefits themselves, in relation to interest that has accrued on the wrongly withheld benefits, in relation to investment returns enjoyed through the monies wrongly withheld from SCV, in relation to level-funded plan profits enjoyed through the wrongly withheld monies, and / or *et cetera*.

54.    It is unjust under the circumstances for Defendants to underpay SCV's claim.

55.    SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject medical services.

56.    As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement).

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, UnitedHealthcare Insurance Company, Siemens Corporation, and Siemens Corporation Group Insurance and Flexible Benefits

Program, for liability and for damages including, but not limited to, (a) past-due monies owed for the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement), (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT IV – *QUANTUM MERUIT*

SCV re-alleges Paragraphs 1 through 34 (namely, as it pertains to this Count, Paragraphs 8-19, 24-29, 31-33)[15] as if fully set forth herein, and further alleges as follows.

57.    SCV conferred a direct benefit on Defendants by providing Defendants' insured / member (P.M.) with medical services to which the insured was entitled under the insurance policy (covered) as evidenced by Defendants' partial payment. Examples of "conferral of benefit" (in the form of questions) are discussed in Paragraph 49, *supra*, and incorporated into this count by reference.

58.    SCV billed Defendants its UCR charges for the services as prescribed by a reasonable re-pricing vendor (PMCS) or, for that matter, as prescribed by Florida's publicly available AHCA database (*see* n. 9-10, *supra*) assessing rates of various medical providers of like kind within like geography. The billed charges represent the fair market value of the services rendered.

---

[15] Note that the specific common allegation paragraphs referenced here are the same as Count II because this Count IV is pleaded in the alternative to Count II.

59.    Defendants received the bill from SCV but underpaid SCV for the services.

60.    An implied contract was doubtless established through Defendants' knowledge that services were being rendered and both sides intended for compensation to be paid, with the parties possessing the compensation intention through the course of their past dealings (such as through claim submission letters like that attached here routinely furnished to UHC indicating SCV's expectation to be paid pursuant to the subject re-pricing contract) or otherwise.

61.    In order for the implied contract to have been formed, Defendants did not have to be the recipient of the services or request the services.

62.    SCV is entitled to reasonable compensation for the services (*i.e.*, *quantum meruit*), which is by no means accomplished by Defendants' unsubstantiated unreasonably low payment but is reflected in reasonable sources such as third-party re-pricing vendor's (PMCS) or Florida's publicly available AHCA databases of assessments of SCV's rates. And determination of the proper amount of compensation is a question of fact reserved for a jury.

63.    The circumstances are such that it would be inequitable for Defendants to retain the benefit of the subject medical services without paying SCV the proper value for same.

64.    SCV has no other adequate remedy other than this lawsuit to address the injuries it has suffered as a result of Defendants' underpayment of the monies owed to it in relation to the subject medical services.

65.    As a further result of Defendants' refusal to fully compensate SCV, SCV has been forced to retain legal counsel to represent it in this matter and is accordingly entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement).

WHEREFORE, Plaintiff, Surgery Center of Viera, LLC, requests the entry of judgment against Defendants, UnitedHealthcare Insurance Company, Siemens Corporation, and Siemens Corporation Group Insurance and Flexible Benefits Program, for liability and for damages including, but not limited to, (a) past-due monies owed for the subject medical services and all associated awardable accrued interest, (b) attorneys' fees pursuant to Section 627.428 of the Florida Statutes or as otherwise awardable (such as, for example, through a prospective statutory offer of judgment / proposal for settlement), (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## JURY DEMAND

66.    Plaintiff, Surgery Center of Viera, LLC, demands a trial by jury on all issues so triable as a matter of right.

Dated:  April 25, 2022.

Respectfully Submitted,

**CALLAGY LAW, P.C.**
1900 N.W. Corporate Blvd., Ste 310W
Boca Raton, Florida  33431
(561) 405-7966 (o); (201) 549-8753 (f)

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
Fla. Bar No. 41103
jgreyber@callagylaw.com
hcasebolt@callagylaw.com
*Attorney for Plaintiff*